# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and | Case No. 3:24-cv-00012-JCH |
| STATE OF CONNECTICUT, | The Honorable Janet C. Hall |
| Plaintiffs, | |
| v. | **MOTION AND MEMORANDUM IN SUPPORT OF PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT** |
| CHASE NISSAN LLC, a limited liability company, also d/b/a MANCHESTER CITY NISSAN, *et al*. | April 21, 2025 |
| Defendants. | |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Federal Trade Commission ("FTC") hereby moves for summary judgment on Counts I–IV and VI against Defendants Chase Nissan LLC, also d/b/a Manchester City Nissan ("Chase Nissan"), Patrick Dibre, Refaat Soboh, aka Brian Soboh, Michael Hamadi, Aiham Alkhatib, Matthew Chmielinski, and Fred Mojica, aka Freddy Mojica and Count V against Defendants Chase Nissan, Dibre, Soboh, Hamadi, and Alkhatib. In support of this Motion, the FTC submits a supporting Memorandum of Law, a Joint Local Rule 56(a)1 Statement of Undisputed Material Facts, Exhibits, and a proposed injunction (submitted with the State of Connecticut's motion for summary judgment).

ORAL ARGUMENT NOT REQUESTED

WHEREFORE, the Federal Trade Commission moves this Court to enter judgment on counts I–IV and VI against all Defendants and on Count V against Chase Nissan, Dibre, Soboh, Hamadi, and Alkhatib, and issue the proposed injunction.

Respectfully submitted,

*/s/ Samuel Jacobson*

Samuel Jacobson (phv207659)
Edward Smith (phv207656)
Paul Mezan (phv207738)
Daniel Hanks (phv208202)
Daniel Dwyer (phv208445)
Julia E. Heald (phv208446)
Federal Trade Commission
600 Pennsylvania Ave., NW
Mail Stop CC-10232
Washington, DC 20580
Phone: (202) 876-5590 (Jacobson)
Fax: (202) 326-3768
sjacobson@ftc.gov
esmith2@ftc.gov
pmezan@ftc.gov
dhanks@ftc.gov
ddwyer@ftc.gov
jheald@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

ORAL ARGUMENT NOT REQUESTED

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   SUMMARY OF UNDISPUTED FACTS ............................................................ 2

   A.    The CPO Process ......................................................................................... 2

   B.    MCN's Advertisements ................................................................................ 3

   C.    MCN's Sales Process ................................................................................... 5

   D.    MCN's Finance Process ............................................................................... 6

   E.    MCN's False Representations and Unauthorized Charges ......................... 9

   F.    Complaints, Consumer Lawsuits, Compliance Audits, and Government Investigations . 14

   G.    Individual Defendants' Roles in MCN's Misconduct ............................... 16

III.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ........................ 18

   A.    The Undisputed Facts Show that MCN Violated the FTC Act. ................ 18

      1.    Count I:  MCN's Deceptive Price Representations ............................ 19

      2.    Count II:  MCN's Deceptive Certification Claim ............................. 22

      3.    Count III:  MCN's Deceptive Fee and Add-on Representations ....................... 23

      4.    Count IV:  MCN's Deceptive Representations Regarding Authorization of Charges ... 25

      5.    Count V:  MCN's Deceptive State Registration Fee Representations ......................... 25

      6.    Count VI:  MCN's Unfair Charges ................................................... 26

   B.    The Undisputed Facts Show that the Individual Defendants Are Liable for the Corporate Defendant's Law Violations. ............................................................... 28

      1.    Patrick Dibre ...................................................................................... 29

      2.    Brian Soboh ....................................................................................... 32

      3.    Michael Hamadi ................................................................................. 34

      4.    Aiham Alkhatib .................................................................................. 36

      5.    Matthew Chmielinski and Freddy Mojica ........................................ 37

IV.   INJUNCTIVE RELIEF IS NECESSARY TO PREVENT DEFENDANTS' LAW VIOLATIONS .................................................................................................. 38

V.    CONCLUSION .................................................................................................. 40

# TABLE OF AUTHORITIES

## Cases

*Exposition Press, Inc. v. FTC,*
  295 F.2d 869 (2d Cir. 1961) ........................................................................... 20

*FTC v. Amazon.com, Inc.,*
  2016 WL 10654030 (W.D. Wash. July 22, 2016) ........................................... 27

*FTC v. Amy Travel Serv., Inc.,*
  875 F.2d 564 (7th Cir. 1989) ................................................................... *passim*

*FTC v. Bronson Partners, LLC,*
  564 F. Supp. 2d 119 (D. Conn. 2008) ...................................................... 23, 34

*FTC v. Celsius Network Inc.,*
  2024 WL 1619360 (S.D.N.Y. Apr. 12, 2024) ................................................. 26

*FTC v. Colgate-Palmolive Co.,*
  380 U.S. 374 (1965) ....................................................................................... 18

*FTC v. Crescent Publ'g Group, Inc.,*
  129 F. Supp. 2d 311 (S.D.N.Y. 2001) ........................................................... 26

*FTC v. Direct Mktg. Concepts Inc.,*
  569 F. Supp. 2d 285 (D. Mass. 2008) ............................................................ 32

*FTC v. Educare Ctr. Servs., Inc.,*
  433 F. Supp. 3d 1008 (W.D. Tex. 2020) ........................................................ 40

*FTC v. Elegant Solutions, Inc.,*
  2020 WL 4390381 (C.D. Cal. July 6, 2020) .................................................. 30

*FTC v. Five-Star Auto Club,*
  97 F. Supp. 2d 502 (S.D.N.Y. 2000) ....................................................... *passim*

*FTC v. Fleetcor Tech., Inc.,*
  620 F. Supp. 3d 1268 (N.D. Ga. 2022) .................................................... *passim*

*FTC v. Freedom Commc'n, Inc.,*
  401 F.3d 1192 (10th Cir. 2005) ..................................................................... 28

*FTC v. Gem Merchandising Corp.,*
  87 F.3d 466 (11th Cir. 1996) ......................................................................... 38

*FTC v. Hoyal & Assocs., Inc.,*
  859 F. App'x 117 (9th Cir. 2021) .................................................................. 31

*FTC v. John Beck Amazing Profits, LLC,*
  865 F. Supp. 2d. 1052 (C.D. Cal. 2012) ........................................ 19, 23, 24, 25

*FTC v. Johnson,*
  96 F. Supp. 3d 1110 (D. Nev. 2015) .............................................................. 19

*FTC v. LeadClick Media, LLC,*
   838 F.3d 158 (2d Cir. 2016) ................................................................ 18, 28, 30

*FTC v. LeansSpa, LLC,*
   2015 WL 1004240 (D. Conn. Mar. 5, 2015) ................................................ *passim*

*FTC v. Loewen,*
   2013 WL 5816420 (W.D. Wash. Oct. 29, 2013) .............................................. 31

*FTC v. Med. Billers Network, Inc.,*
   543 F. Supp. 2d 283 (S.D.N.Y. 2008) ........................................................ 39

*FTC v. Millenium Telecard, Inc.,*
   2011 WL 2745963 (D.N.J. July 12, 2011) ................................................... 22

*FTC v. Minuteman Press,*
   53 F. Supp. 2d 248 (E.D.N.Y. 1998) ...................................................... 38, 39

*FTC v. Moses,*
   913 F.3d 297 (2d Cir. 2019) ................................................................ *passim*

*FTC v. Neovi, Inc.,*
   604 F.3d 1150 (9th Cir. 2010) ........................................................ 19, 26, 27

*FTC v. Primary Grp., Inc.,*
   713 F. App'x 805 (11th Cir. 2017) .......................................................... 29

*FTC v. Publ'g Clearing House, Inc.,*
   104 F.3d 1168 (9th Cir. 1997) ........................................................ 28, 29, 33

*FTC v. Publishers Bus. Servs., Inc.,*
   540 F. App'x 555 (9th Cir. 2013) ........................................................ 32, 34

*FTC v. RCG Advances, LLC,*
   695 F. Supp. 3d 368 (S.D.N.Y. 2023) ....................................................... *passim*

*FTC v. Roca Labs, Inc.,*
   345 F. Supp. 3d 1375 (M.D. Fla. 2018) ...................................................... 21

*FTC v. Ross,*
   897 F. Supp. 2d 369 (D. Md. 2012) .......................................................... 35

*FTC v. Ross,*
   743 F.3d 886 (4th Cir. 2014) ............................................................... 35

*POM Wonderful, LLC v. FTC,*
   777 F.3d 478 (D.C. Cir. 2015) .............................................................. 28

*Removatron Int'l Corp. v. FTC,*
   884 F.2d 1489 (1st Cir. 1989) .............................................................. 21

*SEC v. Mgmt. Dynamics, Inc.,*
   515 F.2d 801 (2d Cir. 1975) ................................................................ 39

*United States v. W.T. Grant Co.,*
   345 U.S. 629 (1953) ........................................................................ 38

**Statutes**

15 U.S.C. § 45(a)(1)..................................................................................................... 18

15 U.S.C. § 45(n)........................................................................................................... 18

15 U.S.C. § 53(b)........................................................................................................... 38

**Rules**

Fed. R. Civ. P. 56(a)...................................................................................................... 18

Plaintiff Federal Trade Commission ("FTC") respectfully submits its memorandum in support of its motion for summary judgment against Defendants Chase Nissan LLC, also dba Manchester City Nissan ("Chase Nissan" or "MCN"), Patrick Dibre, Refaat Soboh, aka Brian Soboh, Michael Hamadi, Aiham Alkhatib, Matthew Chmielinski, and Fred Mojica, aka Freddy Mojica.

## I.    INTRODUCTION

Defendants own and operate an auto dealership, Manchester City Nissan, that defrauded thousands of consumers of nearly $19 million. They repeatedly lied to consumers regarding their vehicles' prices and various fees that they told consumers were required, but in fact were not. They also charged consumers for additional products or services ("add-ons") without their authorization.

Some customers discovered that Defendants hid unauthorized charges in their paperwork after they left the dealership. Other customers never discovered the hidden charges in the lengthy, dense contracts they were told to initial or sign quickly, including after only viewing portions of what the Defendants shared on electronic tablets, at the end of an hours-long transaction. Customers complained in droves. They sued. A third-party auditor cited the dealership at least quarterly for, among other issues, failing to adequately disclose add-ons. The State of Connecticut ("State") notified Defendants it had launched an investigation. The FTC notified Defendants it had launched its own investigation. The State and FTC sued. And still Defendants persisted in their misconduct.

All the while the individual Defendants participated directly in the dealership's misconduct or had authority to control it but failed to stop it. Each also had knowledge of the dealership's unlawful conduct.

The FTC submits that these undisputed facts, further detailed below and in Plaintiffs' Joint Local Rule 56(a)1 Statement of Undisputed Material Facts, warrant summary judgment and an injunction.[1]

## II.    SUMMARY OF UNDISPUTED FACTS

Defendants owned and operated a dealership, Manchester City Nissan, in Manchester, Connecticut. SF ¶¶ 1–14. Defendants Dibre, Soboh, Hamadi, Alkhatib, Chmielinski, and Mojica (collectively, "Individual Defendants") are or were the owners and managers of MCN. SF ¶¶ 2, 4–14. MCN belonged to a group of dealerships, controlled by Dibre, called PSD Automotive Group. SF ¶ 4.

### A.  The CPO Process

MCN advertised new, used, and certified pre-owned ("CPO") vehicles. SF ¶ 17. In fact, in certain ads, MCN described itself as the "#1 Factory Certified Nissan Dealer In New England" SF ¶ 23. Before advertising a vehicle as CPO, MCN was supposed to perform an inspection according to a checklist provided by Nissan and to service or recondition the vehicle as needed to meet Nissan's certification requirements. SF ¶ 18. MCN should have reported the sale of any CPO vehicle to Nissan and paid a certification fee. SF ¶ 19. Nissan does not activate its certified warranty unless and until the dealer reports the sale and pays the fee. SF ¶ 20. Certified vehicles come with a limited warranty that guarantees the vehicle's performance for 7 years or 100,0000 miles, whichever comes first. SF ¶ 21.

---

[1] The FTC and State are each moving for summary judgment as to the counts asserted by each plaintiff. To aid the Court's review, Plaintiffs are submitting a single Joint Local Rule 56(a)1 Statement of Undisputed Material Facts and a single joint proposed order setting forth the injunctive relief sought by both Plaintiffs and monetary relief sought by the State.

### B. MCN's Advertisements

MCN advertised particular vehicles, including CPO vehicles, for specific prices on its website, third-party websites, and the vehicles themselves. *Id.* ¶ 22. Below is a portion of an ad from MCN's website, advertising a certified car at $26,000.[2]



MCN claimed that certified vehicles come at the stated prices with an inspection and limited warranty. SF ¶ 24. For example, the above ad lists several items under the header "Nissan Certified Details," including an inspection and a "Limited Warranty: 84 Month/100,000 Mile (whichever comes first) from original in-service date." PX23, Att. E (FTC-PROD-00001323).

---

[2] For the full ad, see PX23, Att. E (FTC-PROD-00001323).

| About |
| --- |

**"Advertised price on all Certified Nissans include NEMAC Captive Finance Rebate**". Rogue S, 4D Sport Utility, 2.5L I4 DOHC 16V, CVT with Xtronic, AWD, Super Black, Charcoal Cloth.
At Manchester City Nissan we want you to know that all our vehicles are priced at a competitive value position to the market. We use an independent 3rd party software to research internet listings on all vehicles in the market so we can ensure that our prices are the most competitive out there. We do this simply so people choose us when they start searching for their next car.
Priced below KBB Fair Purchase Price!
Clean CARFAX. CARFAX One-Owner.
Certified. Nissan Certified Details:

* 167 Point Inspection
* Transferable Warranty
* Plus 1 Year Pre-Paid Maintenance Included.
* Vehicle History
* Limited Warranty: 84 Month/100,000 Mile (whichever comes first) from original in-service date
* Warranty Deductible: $100
* Roadside Assistance


Our Sales, Service and Parts Departments work closely together to provide you with the most enjoyable, least stressful car-buying experience possible. The average tenure for our sales people, managers, technicians and all other employees is over 20 years. Most of them have been career employees of Manchester City Nissan - and with that much experience, you can be sure they'll provide you with the highest quality care for you and your vehicle. We are also proud to be a Better Business Bureau Accredited Business with an A+ rating.

MCN admits that the advertised price for each CPO vehicle included the costs of inspecting, reconditioning, and obtaining certified status for the vehicles. SF ¶ 25.

Consumers who scrolled to the bottom of the page, far below the stated price and information about the specific vehicle, beneath even images of suggested "similar" and "recently viewed" cars, would see the following statement:

Vehicle pricing includes all applicable rebates, including finance and/or lease incentives (for example, VPP owner loyalty, military, college graduate, private offer, etc); some may or may not qualify for all rebates. Tax, title, registration, destination, $699 dealer doc fee (negotiable), and acquisition fees not included in vehicle prices shown. Final purchase price dependent on additional accessories, sales purchase or aftermarket products, never based on credit. While great effort is made to ensure the accuracy of the information on this site, errors do occur so please verify information with a customer service representative. We attempt to update this inventory on a regular basis. However, there can be lag time between the sale of a vehicle and the update of the inventory. Photos are for illustration purposes only and pictures may vary from actual vehicle. See dealer for complete details. Where applicable, prices do not include certification upgrade (7 year or 100k mile powertrain warranty from original in service date.)

SF ¶ 26. There was no asterisk or hyperlink accompanying the listed for consumers to click to find or read the statement. SF ¶ 27. At least one consumer who browsed MCN's website did not see the statement. SF ¶ 28.

The statement was dense and in small font. SF ¶ 29. Importantly, it did not disclaim that the advertised price for CPO vehicles includes the costs of inspecting, reconditioning, and obtaining certified status. SF ¶ 30. Rather, it stated, "Where applicable, prices do not include certification upgrade (7 year or 100k mile powertrain warranty from original service date.)," without further defining the applicability of the certification upgrade. SF ¶ 26. The statement

further noted that the price "includes all applicable rebates" and does not include "[t]ax, title, registration, destination, $699 dealer doc fee" (which it said was negotiable, but MCN almost never charged consumers a lower price, SF ¶ 31) "and acquisition fees." SF ¶ 26. Thus, even if consumers were to find and read the statement, they still wouldn't have known that MCN would double-charge them for certification, that additional certification and other fees are not required and are not actually taxes or state fees, or that the contract might include charges for additional products which consumers never agree to purchase, as described below.

### C.  MCN's Sales Process

Many consumers came to the dealership after seeing MCN's ads, some from out-of-state. SF ¶ 32. At least a couple of consumers called the dealership beforehand to confirm it had the car at the advertised price. SF ¶ 33. Consumers believed that MCN would sell them the advertised vehicle for the advertised price. SF ¶ 34. Once consumers decided which vehicle they wanted to purchase or lease, MCN and its sales managers prepared a worksheet or "pencil" for consumers. SF ¶ 35.

On the right-hand side of the pencil, MCN listed the charges that comprise the vehicle's total cost. SF ¶ 36. In numerous cases, MCN included fees related to certifying the vehicle (e.g., "Nissan 167-point Inspection," "CT safety and reconditioning," or "CPO") for vehicles advertised as already certified. SF ¶ 37. Many times, the pencil also included "Taxable Fees (Estimated)". SF ¶ 38. The cost of "Taxable Fees (Estimated)" always was $516. SF ¶ 39. MCN's pay plans incentivized its managers, including Hamadi, Alkhatib, Chmielinski, and Mojica, to add fees or charges to increase MCN's profit on the vehicle. SF ¶ 40.

The salesperson's job at MCN was to go over the pencil with the customer. SF ¶ 41. MCN's management instructed salespersons to review the pencil's terms quickly and to do their best to avoid discussing the fees with consumers beyond a cursory explanation. SF ¶ 42. In

numerous instances, MCN represented that consumers were required to pay additional fees related to certification to purchase vehicles. SF ¶ 45. For example, an MCN salesperson told Paige Simonds that the certification fee "was just a fee that they charged for certified upgrades." PX48 (Simonds Tr. at 42:10–11). Similarly, an MCN salesperson told Jennifer Davis, "Oh, yeah, in order for it to be certified, you have to do that." PX43 (Davis Tr. at 48:22–23). Consumers had to sign the pencil to purchase their vehicle, SF ¶ 43,

, SF ¶ 44.[3]

### D.  MCN's Finance Process

Once consumers settled on a price for the vehicle, they met with a finance manager to review the terms of their purchase, financing, or lease. SF ¶ 46. The finance manager received the pencil from sales and input the vehicle's final price, inclusive of all fees, into the contract. SF ¶ 47. Consumers often waited an hour or more to meet with a finance manager at MCN. SF ¶ 49. But once in the finance manager's office, MCN rushed consumers through the closing process. SF ¶ 50.

Consumers typically were presented with multiple complex and highly technical documents on an electronic tablet or computer screen under the finance manager's control.[4] SF ¶ 51. They were required to sign their name in over a dozen places, on an electronic signature pad or the tablet, on paperwork that was to memorialize the agreed upon terms. SF ¶ 51. They frequently were given little or no explanation of the documents they were signing and did not see or have the chance to review them.[5] SF ¶ 52. The finance manager controlled the entire closing

---

[3]

[4] The purchase order, lease agreement, or finance contract was included in the documents consumers signed. In these contracts, MCN included the amount of registration or other state fees the consumer had to pay. SF ¶ 48.

[5] Although consumers' signatures appear on a menu of add-on products ("Add-on Menu") and a form that lists

process, including pointing out where consumers should sign or showing them just the signature block. SF ¶¶ 51, 53.

On top of the agreed-upon final price, MCN often inserted charges for additional products, such as a Guaranteed Asset Protection ("GAP") agreement, Vehicle Service Contract ("VSC"), Prepaid Maintenance Agreement ("PMA"), and Total Loss Protection ("TLP"), into consumers' documents without their knowledge. SF ¶¶ 59–60. Consumers who later discovered the charges report that they did not ask for these products or agree to them, and that the finance manager didn't discuss the add-ons, their cost, or why consumers would want to purchase them. SF ¶ 60. For example, Amy Beaudoin testified that the PMA "was not disclosed to [her]. I did sign for it, but I did not know that I was buying it. . . .Because it was electronic and it was just like, here you go, sign here, here you go, sign here." PX38 (Beaudoin Tr. at 28:6–16). She further explained, "He [Alkhatib] did not stop at any point and say this signature is for this contract. Do you want to purchase this contract? That did not happen." *Id.* Alkhatib never said to her, "do you want to purchase prepaid maintenance?" *Id.*

Likewise, both Walter Parker and Ellen Acheampong testified to not knowing what TLP was, despite MCN charging them for it. Parker stated: "I don't remember accepting Total Loss Protection. I don't even know what that is." PX49 (Parker Tr. at 54:19–20). Acheampong swore that she never heard about TLP until the day of her deposition years later. PX37 (Acheampong Tr. at 144:10–23). Several consumers recall having similar experiences. PX39 (Liszka Tr. at

---

whether consumers agree to accept or decline each add-on ("Verification Waiver" or "Final Acceptance"), many consumers do not recall being presented with those documents by MCN, SF ¶ 54, or checking the boxes indicating whether they agreed to purchase add-ons. SF ¶ 55. In some cases, Total Loss Protection ("TLP") was not included on the Add-on Menu, Verification Waiver, or Final Acceptance despite MCN charging the consumer for TLP. SF ¶ 56. In other cases, MCN did not provide consumers with a copy of the Add-on Menu, Verification Waiver, or Final Acceptance in their paperwork. SF. ¶ 57.
SF ¶ 58.

97:8–24, 101:8–22); PX40 (Evans Tr. at 89:16–90:3); PX41 (H. Rodriguez Tr. at 36:2–37:2, 59:13–23, 59:25–60:17, 62:16–64:17, 74:5–83:1, 86:24–87:2); PX44 (Klucewicz Tr. at 70:15–73:17, 77:2–22, 81:18–82:4); PX45 Att. A (Sullivan Tr. at 45:1–4, 58:6–59:16, 61:1–25), Att. B (Sullivan Tr. at 67:5–11).

In other cases, MCN told or implied to consumers that the dealership or a third party such as the bank or finance company required consumers to purchase add-on products or packages to purchase, lease, or finance the vehicle. SF ¶ 63. For example, Alkhatib told Amy Beaudoin that the finance company wanted her to purchase GAP. PX02 (Beaudoin Dec. ¶ 4). He also said that "she had to" purchase the PMA and VSC and that she "had no choice." PX38 (Beaudoin Tr. at 35:16–18, 36:1–9, 63:10–18). Likewise, a finance manager told Walter Parker that an extended warranty was "mandatory" and he "ha[d] to purchase that." PX49 (Parker Tr. at 87:3–4).

Former employees also swear that MCN told consumers add-ons were required. SF ¶ 64. For example, a former salesperson, Sharon Stokland, states that "sales managers would tell the customer that the [TLP] fee would just be added to the price of the car and that the customer would incur the fee either way." PX19 (Stokland Dec. ¶ 10). Likewise, a former finance assistant, Hannah Tapio, recalls ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ PX34 (Tapio Tr. at 51:2–19).

Alkhatib also intimidated and demeaned several consumers. SF ¶ 65. For example, Heidi Rodriguez cried when Alkhatib spoke with her because of his demeaning tone. PX41 (H. Rodriguez Tr. at 28:15–22) ("When I spoke with him, I literally was crying because of how he was speaking to me. . . . I really should not have somebody to speak with me—speaking at me the way he was. It was kind of like—almost like a demeaning way to speak to somebody.").

Paige Simonds recalls of her conversation with Alkhatib:

> "[e]very time that we would talk about an add-on I would immediately say no, just because I didn't want to spend any more money. . . . But I would say no, and then he would just sit there and stare at me. And I would say no really I'm good….He would explain it again, and then I'd say no again, and then he would just stare at me, and we would sit there in silence for a while until eventually we moved on."

PX48 (Simonds Tr. at 57:7–20). As one consumer warned, "this man is a danger and has a temper that he is clearly unable to control . . . . [Alkhatib] is poisoning the reputation of Nissan and having employees who belittle women is very bad for business." SF ¶ 65. According to Sharon Stokland, MCN's former sales employee, on at least one occasion, the police had to intervene when Alkhatib physically threatened a customer for coming to the dealership seeking a refund for a warranty that was useless. SF ¶ 66. On another occasion, Alkhatib was arrested by the police for disorderly conduct because of an altercation with a customer. SF ¶ 67.

### E.  MCN's False Representations and Unauthorized Charges

As discussed below, MCN charged many consumers more than the advertised price for certified vehicles, charged consumers fees related to certification and add-ons it admits were not required to buy vehicles, did not certify vehicles it advertised as certified, overcharged consumers for registration fees, and did not get consumers' authorization for charges appearing on consumers' contracts.

*MCN Charged More than Advertised.* MCN did not sell many consumers the advertised vehicles for the advertised or listed prices. SF ¶¶ 68–69. Instead, when consumers attempted to purchase vehicles for the prices advertised, MCN charged them hundreds to thousands of dollars in additional fees. SF ¶ 69. In        transactions between April 6, 2019, and August 31, 2024, MCN charged consumers more than the advertised prices, even when accounting for sales taxes and registration fees. SF ¶ 174.

9

SF ¶ 174; PX21

(Miles ¶ 2.H).

MCN tacked on a series of unauthorized charges. First, MCN charged consumers for services that are part of certifying a vehicle on vehicles that were advertised at specific prices as already certified. SF ¶ 70. For example, MCN advertised a "Certified" 2017 Nissan Rogue for $16,480. PX19 (Stokland Dec. ¶ 4, Att. A). MCN did not sell the car for $16,480. Instead, MCN charged, or attempted to charge, the buyer a $5,295.65 inspection fee on top of the price advertised for a vehicle that was advertised as already inspected as part of the certification process. *Id.* ¶ 4, Att. A. In another instance, MCN advertised a "Certified" 2018 Nissan Altima for $14,120, but then charged, or attempted to charge, the buyer a $2,525.00 fee for "connecticut [sic] safety and reconditioning" (even though these charges had nothing to do with the State of Connecticut, as noted below) on top of the price advertised for a vehicle that was advertised as already certified and thus reconditioned.[6] *Id.* ¶ 4, Att. A. MCN's double charging was not limited to those consumers. Indeed, MCN charged consumers fees related to certification in at least instances where their vehicles were advertised as already certified. SF ¶ 71.

Second, MCN included charges for additional products that consumers never agreed to purchase in the closing documents for many deals. SF ¶ 72. Those charges commonly amount to hundreds or thousands of dollars and are typically added to the amount financed and spread out over monthly payments, SF ¶ 73, making the added charges more difficult to detect. Many consumers discovered that MCN charged them for add-ons only after they had left the dealership. SF ¶ 74. For other consumers, MCN did not give them a copy of their agreements and other paperwork when they left the dealership. SF ¶ 75.

---

[6] Both vehicles were advertised as certified. PX21 (Miles ¶¶ 29-30).

In some instances, MCN charged consumers for add-ons that they told the consumers were free. SF ¶ 77. For example, MCN indicated to Donald Evans that he was getting a warranty at no extra cost. PX40 (Evans Tr. at 91:8–15, 95:7–96:1, 105:13–106:12). He later discovered that MCN charged him $4,160 for a service contract. PX04 (Evans Dec. ¶ 8). Likewise, MCN told Matthew Messina that his monthly payments would include "free oil changes and tire rotations." PX13 (Messina Dec. ¶ 5). MCN nevertheless charged him for these items. PX23, Att. C1 (MCN-103704 at 06, 12). Alkhatib told Jefferson Barbabosa that "oil changes and an extended warranty" would be included "at no extra cost." PX42 (Barbabosa Tr. at 69:22–70:2). Alkhatib nevertheless charged him $1,100 for a prepaid maintenance agreement that covers oil changes and $2,990 for a warranty. PX08 (Barbabosa Dec. ¶ 7, Att. A at 001134, 46).

In other instances, MCN charged consumers for add-on products that consumers specifically declined. SF ¶ 78. For example, Kate McNeill "declined TLP with the salesperson and c[a]me to find out it was snuck in my contract." PX23, Att. C1 (MCN-021765). In fact, MCN's policy was to include TLP in all deals. SF ¶ 79.[7] MCN's pencils often referred to TLP not by any product name, but rather as "Taxable Fees (Estimated)" even though these fees are not required by any state, not a tax, and not estimated—they're always $516. SF ¶¶ 38–39, 80, 105. MCN created or generated many TLP contracts after consumers had left the dealership, SF ¶ 81, and it charged consumers for TLP in those deals and 94% of deals. SF ¶ 82.[8] Tellingly, MCN

---

[7]

[8]

. SF ¶ 83.

11

consumers used their add-ons substantially less than consumers that went to other dealerships. SF ¶ 84.

Former employees also swear that MCN did not disclose one or more add-ons before charging consumers for those add-ons. For example, Sharon Stokland swears that MCN disguised TLP as "taxable fees" so that it would appear to customers as legitimate, and they would not question the fee. PX19 (Stokland Dec. ¶ 9). She also states that MCN's managers "instructed salespeople not to describe TLP or what TLP does [for] the customer unless pressed by the customer." *Id.*

Likewise, Hannah Tapio recalls



*"Required" Fees and Failure to Certify.* Consumers also are not required to pay fees related to certification to purchase vehicles that are advertised as already certified, despite MCN telling consumers otherwise. Nissan specifically prohibits MCN from charging a separate fee for certification. SF ¶ 87. Its CPO Process guide states,

SF ¶ 87. Also, the State of Connecticut does not require consumers to pay a fee for safety and reconditioning. SF ¶ 88.

Moreover, despite advertising vehicles as certified, MCN did not report the sale of numerous vehicles to Nissan or pay the certification fee, which means that consumers did not receive certified vehicles or the benefits of the limited manufacturer warranty. SF ¶¶ 89–90. In fact, Plaintiffs found that there were    instances in which MCN advertised and sold a Nissan CPO vehicle, but did not report the vehicle to Nissan Extended Services North America G.P. ("NESNA") and NESNA did not issue a CPO limited warranty. SF ¶ 89. Thus, some of those consumers ended up paying twice for a product (i.e., the CPO limited warranty) they did not receive once.

In addition, consumers are not required to enter into add-on agreements to purchase, lease, or obtain financing for a vehicle, despite MCN telling consumers otherwise. Neither the State of Connecticut, finance companies, nor third-party add-on providers require the sale or purchase of add-ons. SF ¶ 91.

*Overcharged state fees.* Furthermore, MCN overestimated the amount of registration and other fees the State would charge customers and did not refund consumers fully or at all. SF ¶¶ 92–93. MCN overcharged consumers for registration and other state fees in 34.3% of the deal jackets from a random sample that covered the time period of April 1, 2019, to April 29, 2022, and in 8.0% of the deal jackets from a random sample that covered the time period of February 1, 2023, to May 16, 2024. SF ¶ 94.

*Lack of Authorization.* Finally, as the foregoing demonstrates, MCN represented that the charges appearing on consumers' sales or lease contracts were authorized by consumers when, in many cases, they were not.

### F.  Complaints, Consumer Lawsuits, Compliance Audits, and Government Investigations

Defendants persisted in their misconduct despite receiving consumer complaints, consumer lawsuits, compliance audits identifying problems, two government investigations, and this lawsuit. From 2019 through 2024, Defendants received numerous complaints and reviews from consumers on public websites, via the Better Business Bureau, in person, by phone, and by email. SF ¶ 95. Consumers complained that Defendants improperly charged them a price for their vehicles higher than the price that Defendants advertised, a fee related to certification, or add-ons that Defendants inaccurately said were required or without obtaining consumers' express informed consent. SF ¶ 95. In addition, multiple consumers filed lawsuits against Chase Nissan alleging similar issues to the ones alleged in Plaintiffs' complaint. SF ¶ 96.

Furthermore, 

SF ¶¶ 112–16.

In addition, on May 14, 2021, the State of Connecticut Department of Consumer Protection ("DCP") sent a CID to Chase Nissan asking the dealership to identify various fees

---

[9] ███████████████████████████████████████

SF ¶ 112.

appearing in its sales paperwork, including "certification upgrade," "State of CT Inspection and Safety Charge," and "Taxable Fees (Estimated)." SF ¶ 98. Chase Nissan responded ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████ SF ¶ 101. MCN took no steps to change or modify the dealership's policies, procedures, or practices after learning of the State's CID. SF ¶ 106.

On June 24, 2022, DCP sent Chase Nissan a letter warning that advertising a vehicle as certified pre-owned when, in fact, it is not certified or could only become certified if a consumer paid an additional certification fee could constitute an illegal unfair or deceptive act or practice. SF ¶ 103. DCP also questioned Chase Nissan's practice of labeling a charge as a "State of CT Inspection and Safety Charge," noting that a "reasonable consumer could fairly conclude" that it was required when it "has nothing to do with the State of Connecticut, safety of the vehicle or inspection of the vehicle" and is just another name for a certification. SF ¶ 104. Furthermore, DCP warned Chase Nissan that, by calling the fee for VIN etching "Taxable Fee (Estimated)," "a reasonable consumer could fairly conclude that this is a requi[r]ed tax but it is, in fact, a voluntary service option that consumers may decline to purchase." SF ¶ 105.[10]

On April 12, 2022, the FTC sent a CID to Chase Nissan. SF ¶ 107. The CID stated that the FTC was investigating whether MCN has engaged in deceptive or unfair practices in connection with auto sales and leases, in violation of the FTC Act, 15 U.S.C. § 45, resulting in higher vehicle sales prices, periodic payments, or add-on charges. SF ¶ 107. MCN took no steps

---

[10] ████████████████████████████████████████████████████
████████████████████████████████

to change or modify its policies, procedures, or practices after learning of the FTC's CID except

for, ██████████████████████████████████████████████████████

██████████ ████████████████████████████████████████████████

████████████████████████████████████████ SF ¶ 109.

What's worse, MCN's employees would falsify Nissan customer satisfaction surveys on

customers' behalf, further diminishing the chance that Nissan would learn of MCN's practices.

SF. ¶¶ 118–22. Nissan buyers would receive a survey from Nissan after consumers purchased

their vehicle. SF ¶ 118. According to former employees, it was common for MCN's managers to

create fake email addresses for customers so that the sales managers could fill out these surveys

on the customers' behalf. SF ¶ 121. Indeed, in 378 instances, the email addresses consumers gave

MCN differ from the addresses submitted to Nissan, and in all cases the submitter rated the

dealership 10 out of 10 in response to the survey question, "How likely are you to recommend

this dealership?" SF ¶ 122.

### G.  Individual Defendants' Roles in MCN's Misconduct

Individual Defendants carried out MCN's misconduct. Dibre and Soboh are the two

owners or managing members of MCN. SF ¶¶ 6–7. Both had the authority to control everything

at the dealership: ██████████████████████████████████████████████

██████████████████. SF ¶¶ 123–24, 133–34. Dibre bound MCN to ████████████████

████████████████████████████████████████████████████████████

████████████████████████ SF ¶ 123. Both Dibre and Soboh were aware of

---

[11] MCN has not produced any communication showing that it actually distributed these procedures to any of its employees. SF ¶ 110. Furthermore, MCN purports to keep written records of employee discipline but has provided no documentation showing it disciplined any Individual Defendant or employee for violating their policies and procedures (including Alkhatib, who saw the police intervene in multiple altercations he had with customers), despite Plaintiffs' requests. SF ¶¶ 66–67, 117.

MCN's conduct described above. █████████████████████████████████
█████████████████████████████████ ¶ 136. Dibre personally responded
under oath to DCP's 2021 CID, SF ¶ 102, and █████████████████████████
█████████████████████████ SF ¶¶ 125, 137.

Hamadi was the general manager of MCN. SF ¶ 10. He charged consumers fees related to
certification on vehicles advertised as already certified and add-ons without obtaining
consumers' authorization. SF ¶ 141. Hamadi also ████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████████████████████████ SF ¶¶ 138–39.
Hamadi █████████████████████████████████████
████████████████ .

Alkhatib was the most experienced and high-ranking finance manager of MCN. SF ¶ 147.
Alkhatib charged consumers for add-ons without consumers' authorization or after falsely telling
consumers that they were required to purchase add-ons. SF ¶ 149. Alkhatib had authority to
██████████████████████████████████████
██████████████████████████████████████
████████████████████████ .

Chmielinski and Mojica were sales managers of MCN. SF ¶ 14. Both participated
directly in charging consumers fees related to certification on vehicles advertised as already
certified and in charging consumers for add-ons without obtaining consumers' express, informed
consent. SF ¶¶ 160, 164. Both had authority to ████████████████████████

17

██████████████████████████████████████████████

████████████████████████████████████ SF ¶¶ 162, 165.

## III.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT

Summary judgment must be granted if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the undisputed facts show that MCN engaged in a variety of deceptive and unfair practices and that Individual Defendants participated directly in these practices or had the authority to control them, and had the requisite knowledge that these practices were illegal.

### A.  The Undisputed Facts Show that MCN Violated the FTC Act.

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). The statute "is drafted broadly," and "[i]t is important to note the generality of [its] standard[] of illegality; the proscriptions in Section 5 are flexible, to be defined with particularity by the myriad of cases from the field of business." *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 167–68 (2d Cir. 2016) (quoting *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 384–85 (1965)). The FTC brings claims under both prongs of the statute: five counts arising from Defendants' deception and one count alleging unfair practices.

A violation of the FTC Act's deception prohibition requires proof of three elements: "[1] a representation, omission, or practice, that [2] is likely to mislead consumers acting reasonably under the circumstances, and [3], the representation, omission, or practice is material." *FTC v. Moses*, 913 F.3d 297, 306 (2d Cir. 2019) (internal quotations omitted). The FTC need not establish any intent to deceive. *Id.*

A practice is unfair under the FTC Act when it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n).

18

Substantial injury may occur either where a practice inflicts "a small harm [on] a large number of people, or if it raises a significant risk of concrete harm." *FTC v. RCG Advances, LLC*, 695 F. Supp. 3d 368, 387 (S.D.N.Y. 2023) (quoting *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010)). Courts "look to whether the consumers had a free and informed choice" to determine whether consumers' injury is reasonably avoidable. *Id.* (quoting *Neovi*, 604 F.3d at 1158). Finally, "an injury is not outweighed by other benefits when there are 'clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition.'" *Id.* at 388 (quoting *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1151 (D. Nev. 2015)).

### 1.  *Count I:  MCN's Deceptive Price Representations*

MCN's pervasive practice of advertising vehicles for one price, but charging consumers substantially more, violates the FTC Act. In numerous advertisements, MCN featured a specific price for individual cars, often labeled "Your Price." SF ¶ 22; PX23, Att. E (FTC-PROD-00001321, FTC-PROD-00001323, FTC-PROD-00001324). Where, as here, an "advertisement's claim is explicit . . . no extrinsic evidence—in the form of consumer surveys or otherwise—is required to ascertain whether the representation was made." *FTC v. Fleetcor Tech., Inc.*, 620 F. Supp. 3d 1268, 1295 (N.D. Ga. 2022).

MCN's representations regarding vehicles' advertised prices were also likely to mislead reasonable consumers, because they were false. *See, e.g.*, *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012). In many instances, MCN did not sell consumers vehicles at the prices they had been advertised or listed. SF ¶ 68. Instead, MCN charged them hundreds to thousands of dollars more. SF ¶ 69. Unsurprisingly, consumers were misled by MCN's advertisements and expected to be able to purchase or lease vehicles for the stated prices. SF ¶ 34.

MCN's advertised prices also were material to consumers. First, "[i]nformation concerning prices . . . is [considered] material . . . and materiality is presumed for express representations that are shown to be false." *RCG Advances*, 695 F. Supp. 3d at 384; *see also FTC v. LeansSpa, LLC*, 2015 WL 1004240, at *10 (D. Conn. Mar. 5, 2015) ("[A]ny express claim" may be presumed material because "the willingness of a business to promote its products reflects a belief that consumers are interested in the advertising") (internal quotations omitted). Here, MCN's advertising claim that consumers could purchase particular vehicles for specific prices was both express and concerned price; thus it was presumptively material. Further, a representation is material if it "involves information that is important to consumers and that is therefore likely to affect a consumer's choice of or conduct regarding a product." *LeanSpa*, 2015 WL 1004240, at *10. MCN's website explained that it took steps to "ensure that our prices are the most competitive out there" so that "people choose us when they start searching for their next car." *E.g.*, PX23, Att. E (FTC-PROD-00001321). Numerous consumers visited MCN because of the low advertised prices. SF ¶ 32.

Further, even if Defendants had fully and clearly explained to consumers the fees they tacked on (they did not), "an advertisement's material misrepresentation violates Section 5 where it generates a consumer's interest, even if the consumer becomes fully informed before ultimately purchasing the advertised product." *LeanSpa*, 2015 WL 1004240, at *10; *see also Exposition Press, Inc. v. FTC*, 295 F.2d 869, 873 (2d Cir. 1961) ("The law is violated if the first contact is secured by deception . . . ."). For this reason, courts have found similar misrepresentations about the prices to be charged for goods and services to be Section 5 violations. *E.g.*, *RCG Advances*, 695 F. Supp. 3d at 386 (holding that practice of advertising "No Upfront Costs" but nonetheless charging consumers upfront fees violates the FTC Act because

20

the representations were false, and since they were express, they were material and reasonable for consumers to rely upon); *Fleetcor*, 620 F. Supp. 3d at 1297, 1303–04 (concluding that ads overstating price discounts violated Section 5 of the FTC Act); *FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375, 1391–93 (M.D. Fla. 2018) (granting summary judgment as to Section 5 claim where Defendant advertised a low price but explained elsewhere that a higher price could be charged).

To the extent Defendants argue the miniscule disclaimers at the bottom of their website alter the net impression of their advertisements such that consumers would not have expected to pay the amounts advertised, the record does not support them. *See LeanSpa*, 2015 WL 1004240, at \*9 ("In determining whether a representation . . . is likely to mislead consumers, courts are to consider the overall, common sense impression resulting from a representation."). "Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496–97 (1st Cir. 1989). MCN's disclaimer, in tiny, difficult-to-discern italicized print in the footer of its webpages, far below information about the specific car advertised and beneath images of similar and recently viewed vehicles, SF ¶ 26, are inadequate—regardless of their content—to alter the net impression of a vehicle's price. Courts "across the country have determined that, where a disclaimer is buried in fine print and is without accentuation, it is insufficient to alter the net impression." *Fleetcor*, 620 F. Supp. 3d at 1295 (collecting cases).

Even if a consumer managed to find and read the disclaimer, it does not cure the deception. For example, it does not reveal that consumers will be double charged for certification (even if MCN fails to actually perform certification), that additional certification and other fees

21

are not required and are not actually taxes or state fees, or that the contract might include charges for additional products which consumers never agree to purchase. The text refers to inclusion of "all applicable rebates . . . and/or lease incentives," and refers to other fees, including one identified as "negotiable" and another as "not included in prices shown." SF ¶ 26. It goes on to state, "Where applicable, prices do not include certification upgrades," without explaining whether such disclaimer is applicable to CPO vehicles, non-CPO vehicles, or something else— much less that consumers will be double charged even if there is no "upgrade." SF ¶ 26. These vague, general statements, particularly when read together with a dollar amount labeled prominently as "your price," do nothing to alter the net impression of the advertisement that the price of the car is the amount advertised. *See Fleetcor*, 620 F. Supp. 3d at 1296 (concluding as a matter of law that "tiny, inscrutable print of the disclaimers does not cure the net impression of [defendants'] representations"); *FTC v. Millenium Telecard, Inc.*, 2011 WL 2745963, at *8 (D.N.J. July 12, 2011) (granting preliminary injunction where "an ordinary consumer, upon reading said disclaimer in conjunction with [other claims], would be left with little or no idea as to which fees will apply and the circumstances that would trigger such fees").

### 2. *Count II: MCN's Deceptive Certification Claim*

The undisputed facts show that MCN's representations to consumers that it would sell them certified used vehicles with limited manufacturer warranties were deceptive. First, MCN made the claims. *See supra* pp. 9-12. On its website and third-party websites MCN advertised explicitly that it would sell certified used vehicles with limited manufacturer warranties. SF ¶ 24. Because the advertisements' claims were explicit, no further proof is needed to ascertain whether the representations were made. *Fleetcor*, 620 F. Supp. 3d at 1295.

22

Second, this representation was false and likely to mislead consumers. *John Beck*, 865 F.

Supp. 2d. at 1067. To activate a consumer's limited manufacturer warranty, MCN was required

to report the sale of a certified vehicle to Nissan and pay the company a certification fee. SF ¶¶

19–20. For many consumers who were sold advertised certified vehicles, MCN never completed

these steps, meaning their vehicles were never certified and their limited manufacturer warranties

were never activated. SF ¶¶ 89–90.

Third, the representation that MCN would sell consumers certified used vehicles with

limited manufacturer warranties was material. The claim was presumptively material because it

was express. *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 125–26 (D. Conn. 2008); *RCG*

*Advances*, 695 F. Supp. 3d at 384. MCN's advertisements for certified used vehicles plainly state

that they are "certified" and come with a limited manufacturer warranty. SF ¶ 24. The claim is

also material because it "involves information that is important to consumers"—certified

vehicles come with a limited warranty that guarantees the vehicle's performance for 7 years or

100,0000 miles, whichever comes first, SF ¶ 21—"and that is therefore likely to affect a

consumer's choice of or conduct regarding a product." *LeanSpa*, 2015 WL 1004240, at *10

(quoting *Bronson Partners*, 564 F. Supp. 2d at 135).

### 3. *Count III: MCN's Deceptive Fee and Add-on Representations*

The undisputed facts show that MCN's representations to consumers that they were

required to pay fees related to certification and add-ons were deceptive. First, MCN made the

representation. *See supra* pp. 12-13. Consumers report that MCN employees told them they had

to pay certification fees or add-ons to purchase their vehicle. SF ¶ 45. And former employees

swear that MCN told consumers that certification fees and add-ons were required. SF ¶¶ 45, 64.

Second, MCN's representations were likely to mislead consumers acting reasonably under the circumstance because the representations were false. *John Beck*, 865 F. Supp. 2d. at 1067. Despite what MCN told consumers, consumers do not have to pay fees related to certification or add-ons to purchase or lease their vehicle. SF ¶¶ 86–88, 91. MCN admits as much. SF ¶¶ 86, 91.

Third, the undisputed facts show that MCN's representations to consumers that they were required to pay for certification fees and add-ons was material. The claim was presumptively material because it was "express" and concerned "prices or charges for goods or services." *RCG Advances*, 695 F. Supp. 3d at 384. And it affected their decisions; many, if not all, the consumers would not have paid for these fees and charges had they not been told they had to do so. *LeanSpa*, 2015 WL 1004240, at *10.

Disclaimers in the Add-on Menu, Verification Waiver, Final Acceptance, and add-on contracts that explain that the add-ons are optional do not alter the net impression of MCN's claims. First, many consumers report not seeing these documents, and ███████████ ████████████████████████████████████████████████████████ ████████████████████████ SF ¶¶ 54, 57–58, 114. Further, MCN would, at times, ███ ██████████████████████████████████████████████████████████ ████████████████████████ SF ¶ 62. Thus, many consumers did not see these disclaimers. What's more, even if some consumers saw these documents, the disclaimers on the Add-on Menu, Verification Waiver, Final Acceptance, and add-on contracts were buried in tiny, dense, and, in most cases, unaccentuated font at the bottom of the page. *See, e.g.*, PX23, Att. E (FTC-PROD-0008208 at 43–47, 77–78). Courts "across the country have determined that, where

a disclaimer is buried in fine print and is without accentuation, it is insufficient to alter the net

impression." *Fleetcor*, 620 F. Supp. 3d at 1295 (collecting cases).

### 4.    Count IV:  MCN's Deceptive Representations Regarding Authorization of Charges

MCN's contract practices were also deceptive. First, in numerous consumers' contracts

purporting to memorialize agreed-upon terms, MCN lists fees and charges, including for

certification, add-ons, and registration. SF ¶¶ 47–48. By putting these charges in consumers'

contracts, MCN represented that consumers agreed to, or authorized, these charges. Second,

those representations were false and therefore likely to mislead reasonable consumers. *John*

*Beck*, 865 F. Supp. 2d. at 1067. MCN charged many consumers for fees related to certification,

add-ons, and state registration without consumers' knowledge or authorization. *See supra* Part

II.E. Third, the representation presumptively was material because it concerned price, and would

have affected consumers' choices, including whether to pay those charges, negotiate further, or

select another car or dealership. *LeanSpa*, 2015 WL 1004240, at *10.

### 5.    Count V:  MCN's Deceptive State Registration Fee Representations

There is no genuine dispute that MCN's practice of overcharging customers for

registration and other state fees is deceptive. For each transaction, MCN expressly represented in

consumers' purchase order, lease agreement, or finance contract that consumers owed a

particular amount of registration and other state fees to the State of Connecticut Department of

Motor Vehicles ("Connecticut DMV"). SF ¶ 48. The evidence also shows that, in numerous

instances, MCN's representations regarding the amount of mandatory registration and other state

fees owed to the Connecticut DMV were false or misleading. SF ¶¶ 92–94. Because MCN's false

representations were express and concerned price, they are presumed material. *RCG Advances*,

695 F. Supp. 3d at 384; *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 529 (S.D.N.Y. 2000).

And they would have affected consumers' choices, including whether to pay those fees, negotiate further, or select another car or dealership. *LeanSpa*, 2015 WL 1004240, at *10.

### 6.   Count VI:  MCN's Unfair Charges

MCN's practice of cramming into consumers' sales or lease contracts charges for add-ons that the customer never authorized satisfies all three prongs of unfairness:  (i) it causes substantial injury to consumers, (ii) which is not reasonably avoidable by consumers themselves, (iii) and not outweighed by countervailing benefits to consumers or to competition.[12]

First, charging consumers without their consent is without question an injury, *see e.g., Neovi*, 604 F.3d at 1153; *FTC v. Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d 311, 322 (S.D.N.Y. 2001), and the injury caused by MCN's unauthorized add-on charges is without question substantial. To take one example, ███████████████████████████████████████ ███████████████████████████ SF ¶ 79. MCN took numerous steps to impose this charge on every consumer without their authorization or knowledge:  it rushed consumers through a complex contract process in which they were required to sign multiple documents that they frequently were not permitted to read or view, SF ¶¶ 42–43, 50–58, hid the TLP charge on paperwork under the deceptive name "Taxable Fees (Estimated)," SF ¶¶ 38, 80, did not explain to customers that the charge had been added to their contract, SF ¶¶ 50-57, 59–60, and ███ ███████████████████████████████████ SF ¶¶ 62, 81.

Through these tactics, MCN charged consumers $516 each even though they had not agreed to buy—and, in at least one instance, had never even heard of—TLP. SF ¶ 61. ███ ███████████████████████████████████████ SF ¶ 82. By any reckoning,

---

[12] MCN's practice of misrepresenting whether fees and charges were required qualify as unfair practices too, because authorization obtained through deception is not authorization. *See FTC v. Celsius Network Inc.*, 2024 WL 1619360, at *3 (S.D.N.Y. Apr. 12, 2024) ("Authorization, of course, when 'secured by deception,' is not an applicable defense").

unauthorized TLP charges of $516 each imposed on thousands of customers—totaling at least

—is substantial injury. SF ¶ 176–177. But TLP was not the only add-on that MCN

crammed into sales contracts: consumers were also subject to unauthorized charges for a

plethora of other add-ons.[13]

Second, this injury was not reasonably avoidable by consumers because they did not have

a "free and informed choice" that would have enabled them to avoid the injury. *RCG Advances*,

695 F. Supp. 3d at 387 (quoting *Neovi*, 604 F.3d at 1158). Consumers did not have a "free and

informed choice" to avoid add-on charges because they had no idea that MCN was cramming the

charges into their sales contracts without their agreement, and because, as discussed above, MCN

took extensive steps to conceal that they were charging unauthorized add-ons. Consumers cannot

reasonably avoid charges when they have no reason to believe they are being charged. *E.g.*,

*Fleetcor*, 620 F. Supp. 3d at 1325–37 (consumers could not reasonably avoid hidden fees); *FTC*

*v. Amazon.com, Inc.*, 2016 WL 10654030, at *9 (W.D. Wash. July 22, 2016) (consumers cannot

reasonably avoid in-app purchases when they are unaware of their existence).

Third, the cost-benefit prong of the unfairness analysis is "'easily satisfied' where . . . a

practice produces clear adverse consequences for consumers that are not accompanied by an

increase in services or benefits to consumers or by benefits to competition." *Fleetcor*, 620 F.

Supp. 3d at 1337 (collecting cases). Both simple logic and caselaw confirm that there are no

benefits to consumers or competition from imposing unauthorized charges. *Id.* at 1337–38;

*Amazon.com*, 2016 WL 10654030, at *10–11.

---

[13] *E.g.*, PX01 (Acheampong Dec. ¶ 10 (complete care package, service contract)); PX02 (Beaudoin Dec. ¶ 6 (maintenance plan, service contract)); PX04 (Evans Dec. ¶ 8 (GAP, service contract)); PX07 (H. Rodriguez Dec. ¶ 8 (GAP, service contract, maintenance agreement)); PX08 (Barbabosa Dec. ¶ 7 (maintenance agreement, service contract)); PX10 (Klucewicz Dec. ¶¶ 7–8 (maintenance agreement)); PX12 (Michaud Dec. ¶ 10 (service contract, maintenance agreement)); PX14 (Simonds Dec. ¶¶ 11–12 (maintenance plan)); PX15 (Parker Dec. ¶ 9 (service contract, complete care package)).

**B. The Undisputed Facts Show that the Individual Defendants Are Liable for the Corporate Defendant's Law Violations.**

An individual is liable for the deceptive and unfair acts of a corporation if the individual participated directly in them "or had authority to control them." *Moses*, 913 F.3d at 307 (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)); *see also RCG Advances*, 695 F. Supp. 3d at 389 (applying the same standard of individual liability for unfair and deceptive acts). Individuals are further liable for monetary relief, where available, when they "had or should have had knowledge or awareness of the" violative conduct. *Moses*, 913 F.3d at 307 (quoting *Amy Travel*, 875 F.2d at 574).[14]

A defendant participates directly in Section 5 violations when he engages in unlawful "acts or practices that are injurious to customers with at least some knowledge" of the unfair or deceptive practice. *LeadClick Media*, 838 F.3d at 169–70; *see also RCG Advances*, 695 F. Supp. 3d at 389. Authority to control "can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Moses*, 913 F.3d at 307 (quoting *Amy Travel*, 875 F.2d at 573). An individual's status as a founder or owner of the corporate wrongdoer, signatory authority, serving as a general manager, and having the ability to hire and discipline employees, all indicate an authority to control a corporate wrongdoer sufficient to establish individual liability under the FTC Act. *Moses*, 913 F.3d at 307. Whether an individual actually *exercised* their authority to control a corporate wrongdoing is irrelevant; "the dispositive issue" is "whether he *possessed* authority to control it." *Id.* at 308.

---

[14] Recent Second Circuit cases have sometimes discussed the distinct standards for liability for injunctive and monetary relief together, but in those cases the parties (and the Court) were addressing monetary relief only—not injunctive relief. *See Moses*, 913 F.3d at 307; *LeadClick Media*, 838 F.3d at 169. Many courts require proof of an individual's knowledge only to establish monetary relief. *See, e.g.*, *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 498–99 (D.C. Cir. 2015); *FTC v. Freedom Commc'n, Inc.*, 401 F.3d 1192, 1204–07 (10th Cir. 2005); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170–71 (9th Cir. 1997).

The FTC may prove that an individual had the requisite knowledge either "by showing that the individual defendant had actual knowledge of the deceptive conduct, *or* was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning of the truth." *Id.* at 307 (quoting *FTC v. Primary Grp., Inc.*, 713 F. App'x 805, 807 (11th Cir. 2017)). The Second Circuit expressly acknowledged the "breadth" of the FTC Act's individual liability standard, holding that "a more rigid knowledge requirement 'would be inconsistent with the policies behind the [FTC Act] and place too great a burden on the FTC." *Id.* (quoting *Amy Travel*, 875 F.2d at 574). An individual's "participation in business affairs," or knowledge of consumer complaints both indicate the requisite knowledge for a finding of liability. *Id.* at 308–09 (quoting *Amy Travel*, 875 F.2d at 574).

### 1.  Patrick Dibre

It is indisputable that Dibre— ███████████████  █████████ , SF ¶ 2—possessed authority to control MCN's unlawful practices. He held himself out as MCN's Manager and Managing Member when signing on behalf of MCN, such as MCN's annual filings with the Connecticut Secretary of State, ███████████████████████████████████████ ████████████████████████████ SF ¶ 6. He also prepared ███████████████████ ████████████████████████████████████ SF ¶ 102. An individual's "authority to sign documents on behalf of the corporation demonstrate[s] that she had the requisite control over the corporation to be held liable under the FTC Act." *Five-Star Auto*, 97 F. Supp. 2d at 538 (quoting *Publ'g Clearing House, Inc.*, 104 F.3d at 1170).

Beyond his signatory authority, Dibre also had power to control MCN's operations. ████ ████████████████████████████████████████████ ████████████████████████████████████████

29

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████ This level of control easily satisfies the FTC Act's standard. *See, e.g.*,

*Moses*, 913 F.3d at 307 (individual's ownership of 50% of the corporation, signatory authority,

and ability to hire and discipline employees who violated the FTC Act evidence his authority to

control); *FTC v. Elegant Solutions, Inc.*, 2020 WL 4390381, at *12 (C.D. Cal. July 6, 2020)

(finding partial owner individually liable where he provided "some of the funding" for the

businesses, leased office space, and participated in meetings about corporate defendants' defense

of consumer protection case against them).

To the extent Dibre asserts that he rarely chose to exercise his control over the business

he owned—████████████████████████████████████████████████████

████████████████████████████ SF ¶ 127—that offers no escape hatch. The

"dispositive issue" is "whether he *possessed* authority to control" MCN's conduct, not "whether

he *exercised*" it. *Moses*, 913 F.3d at 307–08; *see also LeadClick*, 838 F.3d at 170 (holding that

defendant who "has the authority to control the deceptive practice of another, but allows the

deception to proceed, engages, *through [his] own actions*, in a deceptive act or practice that

causes harm to consumers").

It is also indisputable that Dibre knew of the deceptive and unfair conduct, was recklessly

indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and

intentionally avoided learning the truth. ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ SF ¶¶ 99–105, 125. Responding to inquiries from state regulators clearly demonstrate an individual's knowledge. *See Five-Star Auto Club*, 97 F. Supp. 2d at 538 (holding individual liable where she provided substantive responses about corporation's business in reply to inquiries by states); *FTC v. Hoyal & Assocs., Inc.*, 859 F. App'x 117, 119 (9th Cir. 2021) (affirming finding of at least reckless indifference to illegal practices where individual signed agreement from similar earlier suit and was aware of complaints and inquiries by state investigators).

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ SF ¶ 127. Dibre was aware of at least one of numerous negative online reviews of his dealerships, and went so far as to bring a defamation suit in light of the poster's accusations of improper charges for "upfront fees, frequently $1,000 or more . . . without itemizing or informing consumers of the price of the plan," which "misled [consumers] into believing the plan was free or included with the vehicle." SF ¶¶ 131-132. *See FTC v. Loewen*, 2013 WL 5816420, at *7 (W.D. Wash. Oct. 29, 2013) (finding passive owner liable where he, among other things, received notice of customers' dissatisfaction).

Throughout the dealership's existence, Dibre participated in a variety of business affairs, which courts routinely note is probative of an individual's knowledge. *See Moses*, 913 F.3d at 309 ("The degree of participation in business affairs is a relevant factor in determining whether [a defendant] had knowledge of the Corporate Defendant['s] wrongful actions.") (quoting *Amy Travel*, 875 F.2d at 574). In addition to holding critical roles within MCN and binding it to

agreements in that capacity, SF ¶¶ 6, 123, Dibre participated heavily in MCN's affairs, including:

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    SF ¶ 128. This consistent involvement in various

aspects of MCN's business affairs establishes that he possessed the requisite knowledge. *See*

*FTC v. Publishers Bus. Servs., Inc.*, 540 F. App'x 555, 558 (9th Cir. 2013) (reversing finding that

individual lacked requisite knowledge where he was familiar with operations, policies, and

procedures).

Even after learning of the State's and FTC's investigations, Dibre declined to take any

measures to rectify MCN's unlawful practices. SF ¶¶ 109-111, 129. Instead, he attempted to bury

his head in the sand, ████████████████████████████████████    SF ¶ 130. Waving

away concerns about potential law violations is itself indicative of "an awareness of a high

probability of fraud along with an intentional avoidance of the truth." *FTC v. Direct Mktg.*

*Concepts Inc.*, 569 F. Supp. 2d 285, 311 (D. Mass. 2008) (imposing liability on individual who

dismissed people who expressed concern as mere "skeptics"). To the extent Dibre attempts to use

his inaction to evade liability, the law offers no such backdoor. *See Moses*, 913 F.3d at 308–09

(individual who "neglected his managerial duties in favor of prayer and other spiritual pursuits"

was at least recklessly indifferent to corporate defendant's deception when he did so following

law enforcement action); *Direct Mktg. Concepts*, 569 F. Supp. 2d at 311. For all these reasons,

Dibre is liable for MCN's violations of the FTC Act.

> 2. *Brian Soboh*

Soboh had authority to control MCN. ████████████████████████████████████

████████████████████████████████████    ¶¶ 7, 9. Far from a passive owner,

Soboh possessed and routinely exercised authority over MCN. MCN admits that, as the dealership's owner, ███████████████████████████████████████████████████████████ ████████████████████████████████████████. SF ¶ 133. ████████████████ ██████████████████████████████ SF ¶ 134. For example, Soboh instructed Hamadi to █████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ SF ¶ 134. ████████████████████ ████████████████████████████████████ SF ¶ 134. ████████████████████████████ ███████████████████████████████████████████████ SF ¶ 134. ████████████████ ██████████████████████████████████████████████████ ████████████ SF ¶ 134. Further, █████████████████████████████████████████████████ █████████████████████████████████████████. SF ¶ 134. ███████████████████████ ██████████████████████████████ SF ¶ 137.

Soboh's "active involvement in business affairs and the making of corporate policy," demonstrate his authority to control MCN and its unlawful acts. *Moses*, 913 F.3d at 307–08 (quoting *Amy Travel*, 875 F.2d at 573). In particular, Soboh's status as an owner, signatory authority, and ability to hire and discipline employees all evidence his authority. *Id.* (finding non-controlling owner liable); *see also Five-Star Auto*, 97 F. Supp. 2d at 538 (authority to sign documents on behalf of corporation demonstrates requisite control for FTC Act liability); *Publ'g Clearing House*, 104 F.3d at 1170 (individual's weeklong stint as president and authority to sign documents on behalf of corporation demonstrate control).

Further, Soboh knew or was at least recklessly indifferent to the unfair and deceptive conduct occurring at MCN. ██████████████████████████████████████████████████████



. SF ¶¶ 111–116, 135. Soboh

, SF ¶ 136,

SF ¶ 126.

SF ¶ 134.

SF ¶ 137. *See Five-Star Auto*, 97 F. Supp. 2d at 538 (individual's substantive responses to state inquiries reflect knowledge of corporate defendant's business). Beyond the instances where Soboh learned directly about MCN's deceptive and unfair conduct, his active involvement in MCN's operations and business affairs described above are themselves highly probative of his knowledge of MCN's illegal acts. *Moses*, 913 F.3d at 309; *Publishers Bus. Servs.*, 540 F. App'x at 558.

### 3. Michael Hamadi

Hamadi directly participated in unlawful conduct. As General Manager, he created and reviewed MCN's online advertisements, including those advertising vehicles as certified, and determined vehicle and pricing information. SF ¶ 139. In addition, Hamadi himself charged consumers inspection, service, reconditioning, and certification fees on vehicles advertised as already certified. SF ¶ 141. *See Bronson Partners*, 564 F. Supp. 2d at 136 (finding defendant individually liable for company's violation of the FTC Act because he "was responsible for the text and dissemination of [] advertisements.").

Hamadi also had authority to control all of MCN's unfair and deceptive practices. As General Manager,

█████████████████████████████████████████████ SF ¶ 138. This

day-to-day work overseeing all aspects of MCN's operations is highly probative of Hamadi's

power to direct or stop MCN's misconduct. *See Moses*, 913 F.3d at 307 (finding that "[a]uthority

to control the company can be evidenced by active involvement in business affairs and the

making of corporate policy.") (quoting *Amy Travel*, 875 F.2d at 573); *see also LeanSpa*, 2015

WL 1004240, at *11 (stating that "[a]uthority to control an entity can be evidenced by the 'ability

to review and approve advertisements . . .'") (quoting *FTC v. Ross*, 897 F. Supp. 2d 369, 382 (D.

Md. 2012) *aff'd*, 743 F.3d 886 (4th Cir. 2014)).

Hamadi also knew of, or was at least recklessly indifferent to, MCN's unfair and

deceptive acts and practices. An individual's "degree of participation in business affairs" is

relevant to determining their knowledge of a corporation's law violations, and for a "general

manager . . . intimately involved with the unlawful activities at issue," like Hamadi, "that factor

is dispositive." *Moses*, 913 F.3d at 309. An individual also has knowledge of the acts in which

they directly participate. *See RCG Advances*, 695 F. Supp. 3d at 386, 389 (finding individual's

knowledge of misrepresentations on website "evidenced by his authority and involvement with

creating content for [company's] website" and finding it "fair to deduce" individual had

knowledge of illegal practice in which he participated).

Further, Hamadi ████████████████████████████████████



. SF ¶ 142. He also knew ████████████████

████████████████████████████████████████████

SF ¶ 136. In addition, ██████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████. SF ¶ 143. *See RCG Advances*,

695 F. Supp. 3d at 389 (finding that an individual defendant had requisite knowledge of

violations after "a customer complained directly to [him]").[15]

### 4. Aiham Alkhatib

Alkhatib, MCN's most experienced and high-ranking finance manager, SF ¶ 147, directly

participated in MCN's violations related to add-ons. In fact, Alkhatib committed many of these

violations himself: he personally crammed charges into customers' sales contracts for add-ons

they hadn't agreed to, and personally deceived consumers by falsely claiming that they were

required to purchase certain add-ons either to obtain financing, to meet state law requirements, or

simply because the add-on was supposedly mandatory SF ¶¶ 149, 155. And, in his role as MCN's

top finance manager, Alkhatib ████████████████████████████████████████████

████████████████████████████████. SF ¶¶ 147, 150. There is no question that Alkhatib

had actual knowledge of MCN's add-on violations because he himself committed them. *See RCG*

*Advances*, 695 F. Supp. 3d at 389.

Alkhatib also directly participated in MCN's misrepresentations related to the sale of

CPO vehicles, authorization of charges, and state registration and other fees. As finance manager,

Alkhatib created, and induced customers to sign, sales contracts for their vehicle transactions. SF

¶¶ 47–53. The contracts that Alkhatib prepared (i) double-charged customers by adding fees

related to certification on vehicles that MCN had advertised as already certified, (ii) included

charges for add-ons that the customer had not authorized, and (iii) overcharged for state

registration and other fees. SF ¶ 149. And when MCN sold a vehicle as CPO without registering

the vehicle as certified with Nissan, *see supra* Part II.E, it was Alkhatib (or another finance

---

manager he had trained) who deprived the customer of the Nissan warranty they had paid for by not registering the vehicle. SF ¶¶ 147–148.

As already explained, there is no question that Alkhatib knew that the add-ons he included in sales contracts were unauthorized, as he personally added them without authorization. And given his direct involvement in creating sales contracts, Alkhatib either actually knew that MCN was double-charging customers, charging them for warranties they would not receive, and overcharging them for state registration and other fees, SF ¶¶ 149–158, or was recklessly indifferent to whether it was doing so. *See RCG Advances*, 695 F. Supp. 3d at 389. Lastly, ███████████████████████████████████████████ SF ¶ 156, Alkhatib also knew that MCN's advertised prices were deceptive because he himself was cramming unauthorized charges into the customer's contract that resulted in consumers not getting the advertised price. Further, the police had to intervene in two separate interactions Alkhatib had with customers, including when he threatened a customer seeking a refund for an add-on. SF ¶¶ 66–67.

### 5.  *Matthew Chmielinski and Freddy Mojica*

As sales managers, Chmielinski and Mojica charged certification fees for vehicles advertised as already certified. SF ¶¶ 14, 160. ████████████████████████ which often listed fees related to certification and "taxable fees (estimated)," ¶¶ 160, 35–38, and ██████ ███████████████████████████████████████████████████ ████████████. SF ¶¶ 42, 161. As sales managers, they also had authority to control MCN's violations. ████████████████████████████████████████ ███████████████████████████████████. SF ¶ 162. This evidence suffices to show that Chmielinski and Mojica participated directly in MCN's unfair and deceptive practices and had authority to control them. *See Moses*, 913 F.3d at 308 (serving as manager with ability to

hire and discipline employees is evidence of authority to control); *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 467–68 (11th Cir. 1996) (affirming individual who "controlled the day-to-day affairs" of business and "in a position to control the salespeople's behavior" was individually liable).

Chmielinski and Mojica also knew of these unlawful practices, which they carried out. *See RCG Advances*, 695 F. Supp. 3d at 389. Although the FTC need not prove that Defendants knew their conduct was illegal, ███████████████████████████████████████████████

███████████████████████████████████████████████████. SF ¶ 163. ████████

███████████████████████████████████████████████████████████████

██████████████████████ SF ¶ 164. ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████ SF ¶ 165. This evidence shows that Chmielinski and Mojica had the requisite knowledge for FTC Act liability. *See Moses*, 913 F.3d at 308 (manager's knowledge of relevant consumer complaints sufficient to show knowledge for individual liability).

## IV. INJUNCTIVE RELIEF IS NECESSARY TO PREVENT DEFENDANTS' LAW VIOLATIONS

Section 13(b) of the FTC Act expressly authorizes courts to grant a permanent injunction against violations of any provisions of law enforced by the FTC. 15 U.S.C. § 53(b). The availability of injunctive relief "does not turn on whether the person or entity . . . is acting fraudulently as distinct from recklessly or due to sheer ignorance. The effect on consumers is the same in any event." *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 260 (E.D.N.Y. 1998). An injunction likewise remains appropriate to protect consumers where "there exists some cognizable danger of recurrent violation," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), "or some reasonable likelihood of future violations," *Minuteman Press*, 53 F. Supp. 2d at

260 (internal quotations and citations omitted); *see also FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 323 (S.D.N.Y. 2008). Prior illegal conduct is highly suggestive of the likelihood of future violations, *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975), as are factors including "defendant[s'] scienter, whether the conduct was isolated or recurrent, whether defendant[s are] positioned to commit future violations, the degree of consumer harm caused by defendant[s], defendant[s'] recognition of his culpability, and the sincerity of defendant[s'] assurances (if any) against future violations." *RCG Advances*, 695 F. Supp. 3d at 396 (internal quotations omitted).

Here, there is a high likelihood of future violations absent injunctive relief. First, Defendants' conduct also was recurrent, not isolated. Defendants have engaged in illegal conduct for years, even after complaints, audits, and government investigations and actions. SF ¶¶ 95–116. Consumers continued complaining about the dealership well after Plaintiffs filed suit. SF ¶ 95. This fact alone indicates the likelihood of future violations. *Mgmt. Dynamics*, 515 F.2d at 807. Other factors weigh in favor of injunctive relief as well.

Defendants also had scienter. Hamadi, Chmielinksi, and Mojica admitted that it was wrong to charge consumers for certification fees on vehicles advertised as already certified but did so anyway. SF ¶¶ 142, 143, 163. And many consumers accused Alkhatib of lying to them about add-ons or charging them for add-ons without their knowledge or authorization. SF ¶ 63–65, 149. Additionally, Defendants are positioned to commit future violations. Individual Defendants still work in the auto dealership industry, some as sales or finance managers, some as general managers or owners.[16] SF ¶¶ 4, 8–16. If the injunction doesn't cover them, they can continue violating the law at other dealerships. Chase Nissan is an active corporation, PX23, Att.

---

[16] Hamadi reports that he is currently unemployed, but still has the capacity to work in the auto dealership industry. SF ¶ 11.

G2 (CN Annual Report, Mar. 23, 2025), and could easily reopen. *See FTC v. Educare Ctr. Servs., Inc.,* 433 F. Supp. 3d 1008, 1014 (W.D. Tex. 2020) (enjoining corporations because although they ceased doing business when plaintiffs filed suit, they remained active corporations).

Furthermore, Defendants' practices caused consumers' substantial harm. Defendants' bogus fees each cost consumers hundreds or thousands of dollars on their vehicles purchases, SF ¶¶ 31, 69, 73, 174–177, and a reasonable calculation of total consumer harm stemming from Defendants' unlawful conduct is nearly $19 million, SF ¶ 174.

Far from recognizing their culpability, Defendants have shown no signs of remorse for their actions. ███████████████ despite knowing that they were relevant to the State and FTC's investigations, SF ¶ 44, and took almost a year to respond partially to the FTC CID, SF ¶ 108. Hamadi ████████████████████████████████████████████ ████████████████████████████████████." PX26 (CN Tr. at 151:18–152:14). And Alkhatib became demeaning, intimidating, and, in some cases, violent when questioned about charges for add-ons. SF ¶¶ 65–67.

These facts demonstrate a high probability that future violations will occur and warrant entering injunctive relief. For a discussion of Plaintiffs' proposed injunction, see the State's memorandum.

## V.    CONCLUSION

For the foregoing reasons, the FTC respectfully requests that the Court grant it summary judgment on counts I–IV and VI against all Defendants and Count V against MCN, Dibre, Soboh, Hamadi, and Alkhatib, and issue the proposed injunction.

Respectfully submitted,

*/s/ Samuel Jacobson*

Samuel Jacobson (phv207659)
Edward Smith (phv207656)
Paul Mezan (phv207738)
Daniel Hanks (phv208202)
Daniel Dwyer (phv208445)
Julia E. Heald (phv208446)
Federal Trade Commission
600 Pennsylvania Ave., NW
Mail Stop CC-10232
Washington, DC 20580
Phone: (202) 876-5590 (Jacobson)
Fax: (202) 326-3768
sjacobson@ftc.gov
esmith2@ftc.gov
pmezan@ftc.gov
dhanks@ftc.gov
ddwyer@ftc.gov
jheald@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by ECF on April 21, 2025.

/s/ *Samuel Jacobson*

Samuel Jacobson (phv207659)
Federal Trade Commission
600 Pennsylvania Ave., NW
Mail Stop CC-10232
Washington, DC 20580
Phone: (202) 876-5590 (Jacobson)
Fax: (202) 326-3768
sjacobson@ftc.gov

*Attorney for Plaintiff Federal Trade Commission*

1